**BEL CANTO DESIGN, LTD., Plaintiff,**

v.

**MSS HIFI, INC. and John Boey a/k/a Johnny Boey, Defendants.**

**No. 11 Civ. 6353 (CM).**

United States District Court,
S.D. New York.

Dec. 16, 2011.

Benjamin J. Court, John Harper, III, Messerli & Kramer P.A., Minneapolis, MN, Edward Steven Rudofsky, Zane & Rudofsky, New York, NY, Mark A. Larsen, Larsen Christensen & Rico, PLLC, Salt Lake City, UT, for Plaintiff.

Sam Peter Israel, Sam P. Israel, P.C., New York, NY, Troy J. Hutchinson, Benjamin E. Gurstelle, Briggs & Morgan, PA, Minneapolis, MN, for Defendants.

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

McMAHON, District Judge.

### INTRODUCTION

On November 28, 2011, Plaintiff Bel Canto Design, Ltd.'s ("Bel Canto") Motion for Preliminary Injunction came on for hearing. Based upon the Motion for Preliminary Injunction, Bel Canto's Memorandum in Support of its Motion for Preliminary Injunction, the Direct Testimony of Michael McCormick in Support of Bel Canto Design's Motion for Preliminary Injunction ("McCormick Declaration") (ECF No. 88), the Supplemental Direct Testimony of Michael McCormick in Support of Bel Canto Design's Motion for Preliminary

Injunction ("Supplemental McCormick Declaration") (ECF No. 90), the Direct Testimony of P.J. Zornosa in Support of Bel Canto Design's Motion for Preliminary Injunction ("Zornosa Declaration") (ECF No. 89), and the cross-examination of Messrs. McCormick, Zornosa and Boey, and all other documents submitted, including Plaintiff's Exhibits 1 through 74, and the arguments of counsel, the Court makes the following:

### FINDINGS OF FACT

1. Since 1990, Bel Canto has designed, manufactured, and sold fine audio electronic components throughout the United States and internationally. Bel Canto's broad line of audio products include preamplifiers, amplifiers, digital to analogue converters, and virtual battery supplies. In its more than 20 years in business, Bel Canto has emerged as an industry leader and has become well known for its innovative audio systems focused on the importance of the Digital to Analogue Converter ("DAC") control center, as well as efficient, low-power consuming amplifiers and source components.

2. Bel Canto is the owner of United States Trademark Registration Nos. 2,726,987 & 3,226,424 for "Bel Canto" and "e.One," respectively. Bel Canto manufacturers, sells, and markets for sale to the public all of its products using these trademarks.

3. Bel Canto has spent large sums advertising and promoting its products using the "Bel Canto" and "e.One" trademarks throughout the United States and in dozens of other countries. As a result of its extensive promotion and advertising, Bel Canto has become known to the trade and the public, and has established and sustained invaluable goodwill and recognition

for the "Bel Canto" and "e.One" marks as identifiers of Bel Canto products and quality. The monetary value of this goodwill would be difficult to quantify.

4. All of Bel Canto's preamplifiers, amplifiers, digital to analogue converters, and virtual battery supplies have serial numbers affixed to their rear panel as part of the manufacturing process. Bel Canto tracks these serial numbers for invoicing and warranty purposes. Also, to sell products in Canada, Bel Canto is required to accurately track the serial numbers on its products to comply with CSA International requirements. Without a CSA International Factory Inspection report demonstrating compliance with CSA International safety standards, Bel Canto cannot sell its products in Canada. Finally, accurate tracking of serial numbers is necessary so that any safety related complaints can be effectively resolved.

5. Bel Canto's products are supposed to be sold only through a network of authorized dealers throughout the country and through authorized international distributors doing business in some 35 countries. The Authorized Dealership Agreement between Bel Canto and its authorized dealers prohibits Bel Canto dealers from selling Bel Canto products to unauthorized dealers. As a matter of corporate policy, Bel Canto refuses to extend certain services to consumers who purchase Bel Canto products from unauthorized dealers, such as manufacturer's warranty, product and service assistance, product use information, software upgrades, rebates, and recall notices.

6. Defendant MSS HiFi, Inc. ("MSS HiFi") is not an authorized Bel Canto dealer, although it was at one time; it became an authorized dealer in 2009 and was terminated in 2010. However, it advertises Bel Canto products for sale in its stores, and on its own and other websites, and it sells Bel Canto products to consumers in the United States and abroad. *See* Pl.'s Ex. 74. MSS HiFi obtains the Bel Canto products it sells by purchasing them from authorized dealers who are violating their Dealer Agreements by selling to MSS HiFi. MSS HiFi advertises on its website to legitimate authorized dealers that it will buy their inventory of new products in violation of their dealership agreements with the original equipment manufacturers:

> Need to place a $50k or $100k order with a manufacturer in order to get the proper discount? JB Audio can be your secret investor. We are very discreet, and we already have arrangements with a number of dealers to keep the big brothers guessing. We will do everything in our power to protect your interest.

*See* McCormick Declaration ¶ 25 & Pl.'s Ex. 10.

7. Defendant John Boey a/k/a Johnny Boey ("Mr. Boey") owns, controls, and operates MSS HiFi. Bel Canto ended MSS HiFi's authorized dealer status when it learned that Mr. Boey would be involved in its operations.

***Altered Serial Numbers***

8. MSS HiFi has engaged in the practice of altering the serial numbers that are placed on the back of Bel Canto products during the manufacturing process before selling those products.

9. Bel Canto became aware of that MSS HiFi had altered serial numbers on Bel Canto products when a consumer from France, Mr. Saim Bensaada, called Bel Canto with a complaint. MSS HiFi had sold a Bel Canto S300iUSB to Bensaada and told him that the Bel Canto factory would change the voltage on the unit from standard United States current to European current. When he had not received the

converted unit six weeks after he paid for it, Bensaada called Bel Canto to complain about the delay. Bel Canto had no idea what the man was talking about, since it knew nothing about the sale and did not have the product.

10. Shortly thereafter, MSS HiFi shipped Bensaada a Bel Canto C5i instead of the product he had originally ordered, the S300iUSB. MSS HiFi obtained this Bel Canto C5i from Mt. Washington Valley Audiophile, Inc. ("MWVA"), a retail dealer of audio equipment and, until recently, an authorized Bel Canto dealer. When Bel Canto looked into the matter, it ascertained that the exterior serial number on the Bel Canto C5i MSS HiFi sold to the French consumer—C5i–076—was counterfeit. McCormick Declaration ¶¶ 39–50 and Pl.'s Exs. 13–17.

11. Bel Canto had Bensaada remove the rear panel on the C5i unit in his possession. On the inside of the unit there are two "interior" serial numbers, one on the preamplifier and the other on the amplifier. Those numbers were 2237B–110 and 125–942, respectively. McCormick Declaration ¶ 51 and Pl.'s Ex. 15.

12. Mr. McCormick located the "e.One Series Shipping Check Out" for the C5i with the two internal serial numbers. It showed that the actual serial number assigned to the unit before it left the Bel Canto factory was Serial No. C5M06—not 076. The C5i unit bearing that serial number was to Mt. Washington Valley Audiophile—the Bel Canto dealer who in turn sold the unit to MSS HiFi in blatant violation of its Dealership Agreement with Bel Canto. McCormick Declaration ¶ 52–53 and Pl.'s Exs. 16, 18.

13. The counterfeit serial number on the back of the C5i that MSS HiFi sold to Mr. Bensaada, C5i–076, was actually assigned at the factory to a product that Bel Canto sold directly to a company called Hifi Guru OY, in Finland. Pl.'s Ex. 17. From this I conclude that Defendants altered the external serial number on the product sold to Bensaada in order to disguise the identity of its supplier of Bel Canto products—MWVA.

14. Bel Canto terminated MWVA as an authorized Bel Canto dealer as a result of this incident. See Plaintiff's Exhibit 19, which is a letter from Mark A. Larsen to MWVA dated July 13, 2011. Also, Mr. McCormick reviewed the MWVA purchases from Bel Canto since it became an authorized Bel Canto dealer. McCormick Declaration ¶ 54 and Pl.s' Ex. 20. This purchase history indicates that, after its initial order, MWVA purchases were below $2,500 per order. Suddenly, on February 19, 2011, the order jumped to $19,596, and then on April 4, 2011, another relatively large order of $9,214 was placed. These orders were shipped to MWVA. On June 30, 2011, MWVA placed an order for $15,965, which Bel Canto did not fill. McCormick Declaration ¶ 54.

15. Bel Canto then investigated MSS HiFi's listings on eBay and concluded that MSS HiFi was listing Bel Canto products with counterfeit serial numbers. Bel Canto was able to identify a number of serial numbers that appeared in MSS HiFi's web site as corresponding to products that had been sold by Bel Canto to other domestic and foreign consumers, domestic dealers and distributors in foreign countries:

| Bel Canto Model Advertized on Defendants' Website | Actually Sold to |
| --- | --- |
| Bel Canto DAC 3.5VB, Serial No. D35–135 | DAC 3.5VB with attached Serial No. D35–135 sold to its English distributor, Aanvil Audio Ltd. (Bel Canto Invoice No. 5778; attached as Pl.'s Ex. 23 to McCormick Declaration) |

214

| Bel Canto Model Advertized on Defendants' Website | Actually Sold to |
|---|---|
| | Aanvil Audio Ltd. sold this DAC 3.5VB to Input Audio located in Dunkinfield, England. (Aanvil Audio Invoice No. aaL662, attached as Pl.'s Ex. 24 to McCormick Declaration) |
| Bel Canto VBS–1 with Serial No. VBS–118. | VBS–1 with Serial No. VBS–118 to Sound Decisions PTE Ltd., located in Singapore, in August, 2010. (Bel Canto Invoice No. 5564, attached as Pl.'s Ex. 25 to McCormick Declaration) |
| | Sound Decisions PTE Ltd.'s Invoice No. 0920, attached as Pl.'s Ex. 26 to McCormick Declaration, which indicates that, on December 1, 2010, Sound Decisions PTE Ltd., sold it to Mr. Yip Chun, a resident to Singapore. |
| DAC 3.5VB Serial No. D35–139 | Canadian distributor, Evolution Home Entertainment Corp. (Bel Canto Invoice No. 5800, attached as Pl.'s Ex. 27 to McCormick Declaration). |
| Bel Canto REF500m monoblock amplifier (to be sold as a set) Serial Nos. R5M–262 & R5M–263. | REF500m amplifier with Serial No. R5M–262 was sold to Dedicated Audio in the United States with its voltage set to accept 120v/60hz (Bel Canto Invoice No. 5890, attached as Pl.'s Ex. 28 to McCormick Declaration). |
| | Bel Canto REF500m amplifier with Serial No. R5M–263 was sold to Audio Focus located in the France (Bel Canto Invoice No. 5920, attached as Pl.'s Ex. 29 to McCormick Declaration) with its voltage set to accept 220v/50hz. |
| Bel Canto C5i Serial No. C51–112 | Bel Canto sold the Bel Canto C5i with the attached Serial No. C51–112, to a consumer in Florida. (Bel Canto Invoice No. 5953, attached as Pl.'s Ex. 30 to McCormick Declaration) |
| Bel Canto LNS1 with Serial No. LNS–149 | Bel Canto LNS1 with the attached Serial No. LNS–149, sold to its English distributor, Aanvil Audio Ltd. (Bel Canto Invoice No. 5852, attached as Pl.'s Ex. 31 to McCormick Declaration), where it remains in Aanvil Audio Ltd.'s inventory. |
| Bel Canto VBS–1 Serial No. VBS–152 | Bel Canto VBS–1 sold with the attached Serial No. VBS–152, to David Michael Audio in Michigan and drop shipped it to a consumer in Los Angeles. (Bel Canto Invoice No. 5772, attached as Pl.'s Ex. 32 to McCormick Declaration) |
| Bel Canto DAC 1.5 Serial No. D15–220 | Bel Canto DAC 1.5 sold with the attached Serial No. D15–220, to United States Dealer Dedicated Audio located in Arizona. (Bel Canto Invoice No. 6051, attached as Pl.'s Ex. 33 to McCormick Declaration) |
| Bel Canto DAC 2.5 Serial No. D25–156 | Bel Canto DAC 2.5 with the attached Serial No. D25–156, sold to Audio Visions located in San Francisco (Bel Canto Invoice No. 5832, attached as Pl.'s Ex. 34 to McCormick Declaration) |
| Bel Canto REF 1000m, Serial Nos. R1M–127 & R1M–128. | Bel Canto REF 1000m monoblock amplifier with the attached Serial No. R1M–127 sold to Precision Audio located in Illinois (Bel Canto Invoice No. 5797, attached as Pl.'s Ex. 35 to McCormick Declaration) |
| | Bel Canto REF 1000m monoblock amplifier with the attached Serial No. R1M–128 sold to Sound Decision located in Singapore (Bel Canto Invoice No. 5768, attached as Pl.'s Ex. 36 to McCormick Declaration) |

*See* McCormick Declaration ¶¶ 56–80. These serial numbers have been listed on Defendants' advertisements for the exact same Bel Canto models on both the MSS HiFi website and eBay. *See* Pl.'s Exs. 37–46, 55.

### Voltage Alterations

16. Bel Canto has provided further uncontroverted evidence that when selling Bel Canto products to consumers, including advertisements on eBay, MSS HiFi explicitly or implicitly misrepresented to consumers that Bel Canto would alter the voltage from U.S. to European, i.e., from 120v/60hz to 220v/50hz on the Bel Canto products with MSS HiFi-counterfeit serial numbers. In fact, Bel Canto will not alter voltage for products sold by unauthorized dealers. Mr. Boey and MSS HiFi also claimed publically that they would modify Bel Canto products, altering the voltage from U.S. to European, i.e., from 120v/60hz to 220v/50hz. Bel Canto products altered in this way, by unauthorized technicians, pose a risk to consumers, since alterations not performed properly may injure consumers or damage their personal and real property.

17. In order to perform a voltage conversion, it is necessary to first remove the product's casing, or "chassis." Hearing Tr. 11/28/11 (Rough), at 13.

### Warranty Policies

18. As a matter of corporate policy, Bel Canto does not honor warranties for products sold by unauthorized dealers.

19. There are numerous reasons Bel Canto refuses to sell its products through unauthorized dealers. Bel Canto wishes to encourage traditional dealers to present Bel Canto products in display rooms where customers can view and listen to its products, see them demonstrated and personally interact with knowledgeable dealer employees. Absent an incentive to do so, these dealers may not think it worth the trouble of providing these benefits to customers, if their customers can then easily locate the same products advertised at lower prices on the Internet by unauthorized dealers, who do not have the burden of overhead associated with brick-and-mortar locations. Also, Bel Canto products generally are sold only after an audition. It is not appropriate for a dealer to invest the time, effort and expense to audition a Bel Canto product for a customer, only to see the customer go down the street to an unauthorized dealer who has not made a similar investment. Thus, Bel Canto desires to provide an incentive for display room dealers to continue devoting energy, expense, and floor space to Bel Canto products.

20. It is very important that authorized dealers maintain an appropriate atmosphere for the sale of high-end audio products, such as those manufactured by Bel Canto. This includes a presentable showroom and knowledgeable employees. MSS HiFi, for example, currently does not have a retail store with display rooms which would meet Bel Canto's minimum standards.

21. Importantly, Bel Canto only wants authorized dealers with integrity. If a customer has a bad experience with a dealer, the consumer does not necessarily differentiate between the manufacturer and the dealer. Maintaining Bel Canto's reputation in the market place is critical to the operation of its business. Bel Canto does not want to be associated with dealers who have criminal records with felony convictions; Mr. Boey has such a record.

22. Further, on an international level, unauthorized dealers, such as MSS HiFi compete unfairly with authorized dealers

in foreign countries. Mr. Boey admitted on the witness stand that, if asked to do so by a customer, MSS HiFi does not properly declare the value of the goods being shipped abroad; this allows its customers to avoid paying customs taxes, which normally are collected by the shipper. Mr. Boey plainly does not see anything wrong with helping his customers evade payment of lawful taxes and duties; he testified that it was the customer's problem, not his. *See* Hearing Tr. 11/28/11 (Rough) at 91–96. As a matter of corporate policy, Bel Canto authorized dealers do not make false customs declarations.

23. New Bel Canto products sold through authorized Bel Canto dealers have at least a two-year parts and labor limited warranty, *i.e.*, if during the first two years of ownership there is a defect in the unit, Bel Canto will repair it or, at Bel Canto's option, replace it. Bel Canto products purchased from an unauthorized dealer are not eligible for this Bel Canto parts and labor limited warranty.

24. On the other hand, on any Bel Canto product purchased from an unauthorized dealer, Bel Canto does not, as a policy matter, provide a manufacturer's warranty—or at least does not offer the warranty to the extent it is legally possible not to provide it. Where no warranty is provided, the product is not be eligible for service from Bel Canto, software or hardware upgrades, rebates, or any recall or other notices.

25. In addition, Bel Canto will refuse to honor the warranty of a product bearing an altered serial number, regardless of whether the product is sold by an authorized or unauthorized dealer. McCormick Declaration ¶ 37; Supplemental McCormick Declaration ¶¶ 3, 10; Hearing Tr. 11/29/11 (Rough), at 7–8. As noted above, Canadian and European regulators demand the accurate tracking of serial numbers, and Bel Canto uses its system to allow it to provide safety notices and institute targeted recalls, should one become necessary.

26. Finally, Bel Canto will also refuse to honor the warranty of a product that has had its chassis opened by anyone other than an authorized service provider—a process referred to at the Hearing as "cracking the case." *See* Hearing Tr. 11/28/11 (Rough), at 38–40; Hearing Tr. 11/29/11 (Rough), at 7–11.

27. Bel Canto's policies of not honoring a factory warranty if the product is purchased from an unauthorized dealer, or if the product has undergone any unauthorized alterations or modifications (which, as far as Bel Canto is concerned, includes cracking the case), are set forth in the manual that accompanies new Bel Canto products and on Bel Canto's website. *See* Def.'s Ex. 26; Supplemental McCormick Declaration ¶ 3 & Pl.'s Ex. 61.

28. Bel Canto's policies are not unique in the industry. A number of much larger manufacturers have similar policies disclosed on their websites.

29. For example, Marantz is a large manufacturer offering a full line of consumer electronics. Marantz's policy of not honoring a factory warranty if the product is purchased from an unauthorized dealer or the serial number is altered is disclosed on its website—*http://us.marantz.com/us/Support/Pages/Warranty.aspx*:

> One important note: We do ask that you purchase your Marantz from an authorized dealer. **A Marantz component purchased from an UNAUTHORIZED dealer is NOT covered under our warranty. And any unit with a defaced or altered serial number is NOT covered either.**

*See* Supplemental McCormick Declaration ¶ 5 & Pl.'s Ex. 62.

Based upon sales, Bose is the third largest manufacturer of consumer electronics in the United States. Bose's policy of not honoring a factory warranty if the product is purchased from an unauthorized dealer is disclosed on its website: http://www.bose.com/controller?url=/customer_service/site_help/index.jsp#limited_warranty

> What you must do to obtain Limited Warranty Service:
>
> Return product, *with proof of purchase from an authorized Bose dealer,* using the following procedures:
>
>> Contact the Bose organization in your country/region (visit Global.Bose.com for Bose contact information in your country/region) for specific return and shipping instructions;
>>
>> Label and ship the product, freight prepaid, to the address provided by the Bose organization in your country; and
>>
>> Place any necessary return authorization number prominently on the outside of the carton. Cartons not bearing a return authorization number, where required, will be refused.

*See* Supplemental McCormick Declaration ¶ 6 & Pl.'s Ex. 63 (emphasis added).

31. Polk Audio is a consumer speaker manufacturer. Polk's policy of not honoring a factory warranty if the product is purchased from an unauthorized dealer or the serial number is altered is disclosed on its website—*http://www.polkaudio.com/support/warranty-returns.php#q7*

> The warranty is VOID if the serial number of the speaker has been removed or defaced. For the precise and legal terms of the warranty on a given product, refer to the owner's manual....

*See* Supplemental McCormick Declaration ¶ 7 & Pl.'s Ex. 64. The Polk owners' manuals contain the following statement:

> **Defective Products must be shipped, *together with proof of purchase,*** prepaid insured **to the Polk Audio Authorized Dealer from whom you purchased the Product, or to the Factory** at 1 Viper Way, Vista, California 92081. Products must be shipped in the original shipping container or its equivalent; in any case the risk of loss or damage in transit is to be borne by you....

*See* Supplemental McCormick Declaration ¶ 7 & Pl.'s Ex. 65.

32. Bryston is a direct competitor of Bel Canto and sells a similar line of products. Bryston's policy of not honoring a factory warranty if the product is purchased from an unauthorized dealer or the serial number is altered is disclosed on its website:

> To Our Valued Customers:
>
> WARNING: We urge you to use an authorized Bryston dealer or distributor when purchasing a Bryston product.
>
> Bryston products are sold, supported, and serviced through the worldwide network of dealers and distributors listed in the Dealer/Distributor section of this website. If the company selling Bryston product is not listed on this website, we encourage you to e-mail Bryston to confirm whether or not the company selling the product is part of the authorized Bryston network.
>
> **When parties outside of the network of authorized Bryston dealers and distributors sells a Bryston product, Bryston will not honor warranties on those products.**
>
> Proof of purchase in the form of a copy of the bill of sale from an authorized Bryston Dealer/Distributor must be presented to obtain warranty service. (This applies only to product manufactured after February, 2006)

*See* Supplemental McCormick Declaration ¶ 8 & Pl.'s Ex. 66: *http://bryston.com/* Bryston Authorized Dealer/Distributor Statement.

33. Apple is a manufacturer of computer-related products, but is not a direct competitor of Bel Canto. Apple's policy of not honoring a factory warranty if the serial number is altered is disclosed on its website: *http://store.apple.com/Catalog/uk/Images/worldwidewarranty.html*

Apple Warranty exclusions:

This warranty does not apply: . . . (g) if any Apple serial number has been removed or defaced.

*See* Supplemental McCormick Declaration ¶ 9 & Pl.'s Ex. 67.

### Affiliation Claims

34. MSS HiFi has published statements on its web site that arguably suggest that it has some affiliation with and endorsements by Bel Canto. These statements include claims that Bel Canto is the "exclusive online headquarter[ ]" for all Bel Canto Design products; that Bel Canto's national sales manager would attend an event at a MSS HiFi's store on August 3, 2011; that Bel Canto endorses MSS HiFi as a dealer; that Bel Canto and its national sales manager endorse the disclosure of inaccurate wholesale pricing information; and even that Bel Canto's attorneys are of the opinion that MSS HiFi is "best suited" to present Bel Canto products to the world, and that voltage conversions performed by MSS HiFi are as good as those performed by Bel Canto licensed technicians. *See* McCormick Declaration ¶¶ 18, 21 & Pl.'s Exs. 8, 9.

### Litigation History

35. Bel Canto commenced this suit in the District of Minnesota, in July 2011, where it sought and received a temporary restraining order ("TRO") on August 25, 2011. (ECF No. 37.) The August TRO

forbade Defendants from selling Bel Canto products bearing altered serial numbers, making any claims of affiliation with Bel Canto, and otherwise "defaming, diluting, or causing confusion with respect to Bel Canto or its trademarks . . . ." (*Id.* at 13–14.)

36. On September 12, 2011, the TRO was expanded to require Defendants affirmatively to disclaim their affiliation with Bel Canto in any advertisement of Bel Canto products on Defendants' website, in the follows terms:

> MSS HiFi IS NOT AN AUTHORIZED BEL CANTO DESIGN DEALER. ANY BEL CANTO DESIGN PRODUCTS PURCHASED FROM MSS HiFi DO NOT HAVE A MANUFACTURER'S WARRANTY, and WILL NOT BE ELIGIBLE FOR (i) SERVICE FROM BEL CANTO DESIGN, (ii) SOFTWARE OR HARDWARE UPGRADES, (iii) REBATES, or (iv) ANY RECALL OR OTHER NOTICES.

(ECF No. 65, at 15–16.) The September Order also transferred the case to this Court, in order to rule on the instant motion for a preliminary injunction.

### CONCLUSIONS OF LAW

*A. Standard for the issuance of a preliminary injunction*

■ Generally, a party seeking a preliminary injunction must demonstrate that it will suffer irreparable harm absent injunctive relief, and either (1) that it is likely to succeed on the merits of the action; or (2) that there are sufficiently serious questions going to the merits to make them fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 34–35 (2d Cir.2010) (citation omit-

ted); *U.S. Smokeless Tobacco Mfg. Co., LLC v. City of New York,* 703 F.Supp.2d 329, 342–43 (S.D.N.Y.2010).

■ A preliminary injunction "is not a remedy which issues as of course." *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 311, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (quoting *Harrisonville v. W.S. Dickey Clay Mfg. Co.,* 289 U.S. 334, 337–38, 53 S.Ct. 602, 77 L.Ed. 1208 (1933)). Rather, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.,* 555 U.S. 7, 22, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

Bel Canto argues that unless the injunctions it seeks are granted, it will suffer irreparable harm in the form of ongoing Lanham Act violations by Defendants, which cause consumer confusion and impair Bel Canto's goodwill in a way that cannot be measured in money damages. Courts in the Second Circuit have routinely recognized that injunctive relief is appropriate to remedy violations of the Lanham Act. *See, e.g., Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 242 (2d Cir.2009). The motion seeks preliminary relief only under the Lanham Act.

Defendants maintain that their practices do not violate the Lanham Act at all, making injunctive relief inappropriate.

*B. The Lanham Act*

Bel Canto relies on sections 32 and 43 of the Lanham Act, codified at 15 U.S.C. §§ 1114 and 1125. The Second Circuit has set forth the showing required to obtain relief under these sections:

> In order to prevail on a trademark infringement claim for registered trademarks, pursuant to 15 U.S.C. § 1114, or unregistered trademarks, pursuant to 15 U.S.C. § 1125(a)(1), a plaintiff must establish that (1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) "in connection with the sale . . . or advertising of goods or services," (5), without the plaintiff's consent. In addition, the plaintiff must show that defendant's use of that mark "is likely to cause confusion . . . as to the affiliation, connection, or association of [defendant] with [plaintiff], or as to the origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by [plaintiff]."

*1–800 Contacts, Inc. v. WhenU.Com, Inc.,* 414 F.3d 400, 406–07 (2d Cir.2005) (quoting 11 U.S.C. §§ 1114, 1125) (other internal citations omitted); *see also Warner–Lambert Co. v. Northside Development Corp.,* 86 F.3d 3 (2d Cir.1996); *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.,* 816 F.2d 68, 71 (2d Cir.1987).

It is not disputed that Bel Canto's mark is entitled to protection, or that Defendants have used the Bel Canto mark in commerce in connection with the advertising of Defendants' goods without Bel Canto's permission. Rather, the question is whether Bel Canto can demonstrate the likelihood of confusion arising from Defendants' use of its mark.

*C. False claims of affiliation*

Beginning with Bel Canto's request for an injunction prohibiting further false claims of affiliation between it and Defendants, the conduct Bel Canto complains of can be divided into two categories: persistent, and "one-off."

*1. Persistent claims*

■ The persisting conduct consists of Defendants' repeated claim on their website that MSS HiFi is Bel Canto's "exclusive online headquarter." Pl.'s Exs. 7,8. I

find that these statements are not actionable under the Lanham Act because they do not risk confusing consumers as to the affiliation of Bel Canto and Defendants.

First, the claims are not false: no evidence before the Court suggests that other online retailers offer Bel Canto products. Defendants' "exclusivity" is a consequence of Bel Canto's business model, which disfavors online sales in favor of store room sales by authorized dealers; that is the very underpinning of the parties' legal dispute in this case. It therefore is not misleading to call Defendants the "exclusive" source, and even the "headquarter," for Bel Canto products online. This language does not suggest a legal or business relationship between Bel Canto and MSS HiFi, and would not confuse a consumer into believing that such a relationship exists.

Second, Defendants studiously avoid referring to MSS HiFi as an "authorized" Bel Canto dealer on their website. I find a meaningful difference between claiming exclusivity—which could (and does) result from factors other than a relationship between the parties—and authorization, which suggests permission and a legal or business relationship of some nature.

■ Based on the foregoing considerations, I conclude that Bel Canto has not demonstrated a likelihood of success on its Lanham Act claim based on Defendants' persistent practice of holding MSS HiFi out as the "exclusive online headquarter" for Bel Canto products, because Defendants use of the mark in the foregoing phrase does not create a probability of consumer confusion. "For a finding of infringement a probability of confusion, not a mere possibility, must be found to exist." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing and Pub. Co. v. Meredith Corp.,* 991 F.2d 1072, 1077 (2d Cir.1993).

Nor has Bel Canto demonstrated a "sufficiently serious question going to the merits" of its claim; even if it did, I would not find that the equities tip "decidedly" in Bel Canto's favor. *Citigroup.,* 598 F.3d at 35. Thus, Bel Canto is not entitled to an injunction prohibiting Defendants from describing themselves as the "exclusive online headquarter" for Bel Canto products, for so long as that description remains true.

### 2. Claims of endorsement

Bel Canto does identify several particular false statements made by Defendants and incorporating the Bel Canto mark that likely are violations of the Lanham Act.

Specifically, the false statement that P.J. Zornosa—Bel Canto's national sale manager—planned to attend a promotion featuring Bel Canto's full line of products (as well as bikini models and a samosa eating contest), does suggest a business relationship between Bel Canto and the Defendants.

Boey also testified that he directed his friend to post a comment on MSS HiFi's website under the name "Larson and Ricko." This comment, which purports to be authored by Bel Canto's attorneys, Mark Larsen and Lisa Rico, says that it "confirms" that "PJ Zormosa [sic] will be there to officially endorse MSS HiFi as the Online Headquarter for all [Bel Canto] products," and goes on to give a laudatory statement concerning Boey's qualifications and ability. *See* Pl.'s Ex. 8.

As a result of these statements admitted false statements, Bel Canto seeks not only an injunction prohibiting Defendants from making comments tending to suggest that they have some formal affiliation with Bel Canto, but also a mandatory injunction compelling Defendants to post statements

affirmatively indicating that they are not affiliated with Bel Canto.

■ The false statements just described are capable of confusing consumers into believing that there is some affiliation between Bel Canto and Defendants. In a Lanham Act case, demonstrating that the unauthorized use of a trademark is likely to cause confusion is generally sufficient to show the irreparable injury necessary to obtain injunctive relief. As the Second Circuit recently noted, "a 'plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury.'" *Zino*, 571 F.3d at 246 (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir.2005)).

■ On the other hand, even when a likelihood of confusion is shown, an injunction may not be an appropriate remedy, "if other equitable considerations are present." *Hard Rock Cafe International (USA) Inc. v. Morton*, 1999 WL 701388, at *4 (S.D.N.Y. Sept. 9, 1999). In particular, "Injunctive relief may not be appropriate where a party has *voluntarily ceased* its illegal conduct and there is no reasonable expectation that the wrong will be repeated. The necessary determination is that there exists some cognizable danger of recurrent violation." *Id.* (citing *United States v. W.T. Grant Co.*, 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)) (internal quotation marks, alterations, and some citations omitted) (emphasis added); *see also Nike, Inc. v. Top Brand Co. Ltd.*, 2005 WL 1654859, at *9 n. 8 (S.D.N.Y. July 13, 2005) (collecting cases); *Wall v. Construction & Gen. Laborers' Union*, 80 Fed. Appx. 714, 716 (2d Cir.2003) (preliminary injunction properly denied where plaintiff "did not establish that the defendants' challenged actions were ongoing.").

Here, the evidence demonstrates the necessary risk of recurrent Lanham Act violations by Mr. Boey. This is not a case where he "voluntarily ceased" his offensive behavior; to the contrary, he persisted in such conduct even after the August TRO issued, necessitating a second, stronger TRO. For example, Judge Doty found that after the entry of the August TRO, Defendants disparaged Bel Canto by claiming that Bel Canto's ratings of its own products were "deceiving." *See* Order, September 12, 2011 (ECF No. 65), at 2, 10.

Moreover, Bel Canto points to evidence that Boey has in the past made similar false statements about his affiliation with Stereo Exchange, a competitor of MSS HiFi's and an authorized Bel Canto dealer. (*See* Tr. 11/28/22 at 69–70). In connection with its original motion for a TRO before Judge Doty, Bel Canto substantiated these allegations with a declaration from Stereo Exchange's owner, Dave Wasserman. (ECF No. 21.) In it, he details how Defendants falsely claimed a "strategic alliance" with Stereo Exchange, and how this claim damaged his company's goodwill. (*Id.* ¶¶ 2–9.) Wasserman concludes by expressing his opinion that "Mr. Boey's promise that he will not make claims of strategic alliance in the future appears hollow to me." (*Id.* ¶ 10.) This evidence, like that of Mr. Boey's in response to this litigation, further indicates a likelihood of recurrence that, in combination with the unquantifiable nature of the injury his false claims inflict, justifies injunctive relief.

■ However, Bel Canto is entitled only to an injunction prohibiting Defendants from making further false claims of endorsement. The mandatory injunction that Bel Canto seeks would alter, rather than maintain, the status quo. A movant is required to make "a more substantial showing of likelihood of success, both as to

violation and risk of recurrence, whenever the relief sought is more than preservation of the status quo." *Suthers v. Amgen, Inc.,* 372 F.Supp.2d 416 (S.D.N.Y.2005) (quoting *SEC v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990)). As the Second Circuit recently put it, "A mandatory preliminary injunction 'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief.'" *Cacchillo v. Insmed, Inc.,* 638 F.3d 401, 406 (2d Cir.2011) (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir.2010)); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2942 (2d ed. 1995) ("It has been said that courts are more reluctant to grant a mandatory, or affirmative, injunction than a prohibitory, or negative, one.").

I do not find that the extreme remedy of requiring Defendants affirmatively to disclaim affiliation with Bel Canto is necessary in this case. Nor must Defendants stop saying that they sells Bel Canto products—they do, and they are entitled to do so, within the limitations discussed at further length below. But Defendants may not falsely suggest that they have any business or legal relationship with Bel Canto, or that they are authorized Bel Canto dealers. The specific wording of the injunction is set forth in Section G below.

*D. Altered serial numbers*

The second element of relief sought by Bel Canto is an injunction prohibiting Defendants from selling Bel Canto products bearing altered serial numbers. Defendants do not deny that the serial numbers shown in their advertisements are not gen-uine, but claim that the changes are only "photo-shopped" in those ads. However, the evidence overwhelmingly supports the conclusion that Boey's testimony is not credible, and that Defendants do, as a matter of fact, physically alter the serial numbers on at least some of the Bel Canto products they sell.

Defendants nonetheless argue that they cannot be enjoined from selling products bearing altered serial numbers, because under the so-called "first sale doctrine," their resale of Bel Canto products does not violate the Lanham Act. They are in error.

As a general matter, "trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner." *Zip Intern. Group, LLC v. Trilini Imports, Inc.,* 2011 WL 2132980, *3 (E.D.N.Y. May 24, 2011). (quoting *Polymer Tech. Corp. v. Mimran,* 975 F.2d 58, 61 (2d Cir.1992)); *see also H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.,* 879 F.2d 1005, 1023 (2d Cir.1989) ("[T]he unauthorized sale of a trademarked article does not, without more, constitute a Lanham Act violation."). This observation is sometimes referred to as the "first sale doctrine," insofar as it recognizes that "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC,* 562 F.3d 1067, 1071–72 (10th Cir.2009); *see also Davidoff & Cie, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1301 (11th Cir.2001); *NEC Elecs. v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir.1987). The Lanham Act does not give mark holders the right to control subsequent, non-authorized resales, as long as the product sold is genu-

ine.[1]

 The rationale for this doctrine is that "trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold." *NEC Elecs.*, 810 F.2d at 1509 (citing *Prestonettes, Inc. v. Coty,* 264 U.S. 359, 368–69, 44 S.Ct. 350, 68 L.Ed. 731 (1924)); *see also H.L. Hayden,* 879 F.2d at 1023 (when genuine article sold, no possibility of confusion exists). Thus, if a defendant does no more than stock and resell genuine trademarked goods, the mark holder does not have a right to stop it under the Lanham Act. *See, e.g., Zip,* 2011 WL 2132980.

 However, when a trademarked product that is being resold is "materially different" from the product as it is sold by the plaintiff, it is not a "genuine article." As the Tenth Circuit explained in *Beltronics,* "A materially different product is not genuine and may generate consumer confusion about the source and the quality of the trademarked product." 562 F.3d at 1072. Taking a simple example, I cannot, consistently with the Lanham Act, buy Deluxe Brand Coffee, pour out the grounds, fill the can with Gas Station Swill Brand, and sell it in the original packaging on eBay. A customer who bought from me in those circumstances would be confused about the quality of the product actually in the can. Furthermore, upon drinking the Gas Station Swill, the customer would form an unfavorable impression of Deluxe Brand Coffee. Therefore, I would not be protected by the first sale

doctrine if Deluxe Brand Coffee sued to enjoin my sales. *See Original Appalachian,* 816 F.2d at 73.

That said, not every difference between a product in its "first sale" state and a "second sale" product is "material." As the Tenth Circuit explained in *Beltronics:*

> A guiding principle in evaluating whether a difference between two products bearing the same trademark is material is whether the difference "confuses consumers and impinges on the ... trademark holder's goodwill." ... Although no mechanical process exists for determining the threshold for materiality, a difference is material if "consumers [would] consider [it] relevant to a decision about whether to purchase a product." Because many factors influence such considerations, the threshold "must be kept low to include even subtle differences between products."

562 F.3d at 1072–73 (quoting *Davidoff,* 263 F.3d at 1297, and *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633 (1st Cir.1992) ("*Nestle*")); *see also Original Appalachian,* 816 F.2d at 73.

In short, the "first sale doctrine" and its "material difference exception" are proxies for the ultimate inquiry in a Lanham Act infringement case: did the defendant's use of the plaintiff's mark risk consumer confusion and consequent damage the plaintiff's good will? "The purpose of the material difference test is to assist courts in determining whether allegedly infringing products are likely to cause confusion in the marketplace and undermine the goodwill the trademark owner has developed in its trademarked goods." *Beltronics,* 562

---

**1.** This trademark "first sale doctrine" should not be confused with the distinct, albeit related doctrines of the same name in patent law (*see, e.g., Innomed Labs, LLC v. ALZA Corp.,* 368 F.3d 148, 161–62 (2d Cir.2004)), and copyright law, where the doctrine is codified (*see, e.g., John Wiley & Sons, Inc. v. Kirtsaeng,* 654 F.3d 210, 216 n. 14 (2d Cir.2011)). The "first sale" trademark doctrine is recognized in the Second Circuit, see main text, but does not usually bear that appellation.

F.3d at 1074. Generally, when a defendant does no more than stock and resell a plaintiff's trademarked products, no possibility of confusion exists, because the consumer gets just what he thinks he is going to get. On the other hand, when a defendant sells a product that is materially different, but has the exact same appearance as a plaintiff's product, it is presumed likely that the undisclosed difference between the products will confuse consumers and damage the plaintiff's good will.[2] Implicit in this observation is the corollary that if the defendant sufficiently discloses the existence of the difference alleged to be material, then the possibility of confusion arising from the difference is dispelled. *Id.* at 1074.[3]

■ Here, Defendants argue that the first sale doctrine applies, because MSS HiFi customers get a genuine Bel Canto product when they buy from MSS HiFi. This is not a case where Defendants have replaced the original hardware with inferior parts—or even a case where some physical accessory to the product is not included, or differs from a genuine article accessory. *Compare Original Appalachian*, 816 F.2d at 70–72. Consumers who buy Bel Canto products from Defendants receive what they expect—a Bel Canto amplifier or voltage converter. No one is confused, and Bel Canto's goodwill stands or falls on the quality of its product, and nothing else.

Bel Canto argues that the products Defendants sell are "materially different" from genuine article Bel Canto products because the external serial numbers have been altered. Bel Canto relies on *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC,* a case from the Tenth Circuit, which holds that a physically identical product is nevertheless "materially different" from the genuine article if "the bundle of services" that attach to the genuine article is not available to the consumer. 562 F.3d at 1067; *see also Original Appalachian,* 816 F.2d at 68.

*Beltronics* has facts strikingly similar to those in this case. There, Beltronics manufactured radar detectors for automobiles, and sold them through a pair of authorized dealers, both of which agreed to minimum price restrictions. However, as in this case, the authorized dealers violated their dealership agreements by reselling to an unauthorized retailer, Midwest. Midwest, in turn, sold Beltronics products on eBay as "new" Beltronics products.

As here, the products Midwest sold online bore serial numbers that had been altered to mask the identity of the authorized dealers supplying Midwest in violation of their agreements with Beltronics. The Tenth Circuit noted that, "It is Beltronics' policy that only those who purchase Beltronics radar detectors bearing an original serial number label are eligible to receive certain products and services, including

---

2. As a recent opinion by Judge Gleeson of the Eastern District points out, these tests are equally applicable to claims under sections 32 and 43 of the Lanham Act. *Zip Intern. Group, LLC v. Trilini Imports, Inc.,* 2011 WL 2132980, at *4 n. 5 (E.D.N.Y. May 24, 2011) (collecting cases).

3. Given the close relationship between these doctrines and the ultimate inquiry in any Lanham Act case arising under section 32 and 43, several Circuit Courts have recognized the applicability of this analysis outside the context in which the doctrines were first developed: that of so-called "gray goods." *Beltronics,* 562 F.3d at 1072 n. 4 (collecting cases); *see, e.g., Original Appalachian,* 816 F.2d at 71 (applying material difference exception in gray goods case). The parties do not cite a Second Circuit decision applying these tests outside the gray goods context, but I am persuaded that the Second Circuit would reach the same conclusion that other Circuit Courts of Appeal have.

software upgrades, rebates, product use information, service assistance, warranties, and recalls." *Beltronics,* 562 F.3d at 1069.

Beltronics sued Midwest for violations of the Lanham Act, and sought a preliminary injunction prohibiting Midwest from selling Beltronics products bearing altered or counterfeit serial numbers. The District Court for Kansas granted a preliminary injunction, and the Tenth Circuit affirmed. *See generally id.* at 1069–71.

Rejecting Midwest's defense under the "first sale doctrine," the Tenth Circuit found a material difference between genuine article Beltronics products and the products bearing false serial numbers being sold online by Midwest: namely, the unavailability of warranty and other services for products with false serial numbers.

> [A]lthough we have never had occasion to review whether differences in warranties or service commitments may constitute material differences, at least two federal circuit courts have held or observed that they may. The Federal Circuit has held that "physical material differences are not required to establish trademark infringement ... because trademarked goods originating from the trademark owner may have nonphysical characteristics associated with them, including services, such that [the sale of] similar goods lacking those associated characteristics ... may mislead the consumer and damage the owner's goodwill." *SKF USA Inc. v. International Trade Com'n,* 423 F.3d 1307, 1312 (Fed. Cir.2005). Similarly, the First Circuit has observed that "the appropriate test [for materiality] should not be strictly limited to physical differences," but should include other differences such as "warranty protection or service commitments [that] may well render products non-identical in the relevant Lanham Trade–Mark Act sense." *Nestle,* 982 F.2d at 639 n. 7. We are aware of no federal circuit court that has held or observed otherwise when considering the specific question of whether material differences may include warranties and service commitments.

*Beltronics,* 562 F.3d at 1073. Because Midwest's (or its suppliers') practice of altering the serial numbers voided the product's warranty under Beltronics' policy, the radar detectors Midwest sold were materially different from genuine Beltronics radar detectors, and thus Midwest was liable for infringement. *Id.* at 1073–74.

██ The Second Circuit's decision in *Original Appalachian* also supports the proposition that the unavailability of certain services connected with a product can constitute a material difference sufficient to defeat the application of the first sales doctrine. 816 F.2d at 68. There, the court found that physically identical "Cabbage Patch Kids" dolls were nevertheless materially different because the ones the defendant sold without permission in the United States came with Spanish language "birth certificates" and "adoption papers," whereas dolls sold through authorized dealers in the United States came with English language paperwork. The reason for this discrepancy was that the unauthorized dealer had imported dolls that were licensed for sale in Spain only—so-called "gray market" goods.[4]

---

4. Gray market goods are generally defined as "genuine goods that ... are of foreign manufacture, bearing a legally affixed foreign trademark that is the same mark as is registered in the United States; gray goods are legally acquired abroad and then imported without the consent of the United States trademark holder." *Proctor & Gamble Co. v. Xetal, Inc.,* 2008 WL 361140, at *1, n. 4 (E.D.N.Y. Feb. 8, 2008) (quoting *Gamut Trading Co. v. U.S. Int'l Trade Comm'n,* 200 F.3d 775, 778 (Fed.Cir.1999)). "The principle of

When United States customers sought to register their Spanish language birth certificates and adoption papers with OAA, the manufacturer refused; meanwhile, customers who bought authorized Cabbage Patch dolls, and received English language birth certificates, were allowed to participate in the registration process and all that it entailed. *Id.* at 73.

The Second Circuit affirmed the District Court's finding that the availability of the registration process was part of what consumers expected when purchasing a doll. It explains the significance of these accessories:

> Purchasers of the dolls receive "birth certificates" and "adoption papers" to be filled out by the "parent" or owner of the doll, who takes an "oath of adoption." The adoption papers are returned to [the manufacturer,] OAA, and the information is entered into the OAA computer so that on the first anniversary of the adoption the adopting parent receives a "birthday card" from OAA. Judge Conner found that this adoption process is an "important element of the mystique of the [Cabbage Patch Kids] dolls, which has substantially contributed to their enormous popularity and commercial success."

*Id.* at 70 (quoting 640 F.Supp. 928, 930 (S.D.N.Y.1986)). Thus, the concealed fact that the unauthorized importer's dolls were ineligible for such services constituted a material difference that gave rise to a likelihood of confusion and damage to the plaintiff's goodwill. *Id.; see also Zino,* 571 F.3d at 246 (alternative holding) (relying on "material difference" test to find liability for trademark infringement).

Turning to our case, I agree with Bel Canto that, if Defendants are selling Bel Canto products that lack warranty and other services—such as upgrades and recall notices—without alerting its customers to the unavailability of those services, Defendants' products would be materially different from genuine article Bel Canto products, the first sale doctrine would not apply, and Defendants would be liable under the Lanham Act. *Beltronics,* 562 F.3d at 1067; *Original Appalachian,* 816 F.2d at 68.

Sadly, however, in our case there is a complication that may inhibit Bel Canto from simply applying the *Beltronics* rule to this case.

 To establish that the Bel Canto products that Defendants sell lack these services, Bel Canto relies primarily on the fact that MSS HiFi is not an authorized dealer of Bel Canto products. Because it is Bel Canto's corporate policy not to honor warranties for products purchased through unauthorized dealers, it concludes, all Defendants' customers receive products that lack these services—a fact that would not doubt influence their purchasing decision, and therefore risk confusion.

The problem is that, because MSS HiFi is a New York dealer, Bel Canto's policy of refusing to honor warranties on this basis is trumped by section 369–b of the New York General Business Law, which says that:

> A warranty or guarantee of merchandise may not be limited by a manufacturer doing business in this state *solely* for the reason that such merchandise is sold by a particular dealer or dealers, or that the dealer who sold the merchandise at retail has, since the date of sale, either gone out of business or no longer sells such merchandise. Any attempt to limit

gray market law is that the importation of a product that was produced by the owner of the United States trademark or with its con-

sent, but not authorized for sale in the United States, may, in appropriate cases, infringe the United States trademark." *Id.*

the manufacturer's warranty or guarantee for the aforesaid reason is void.

GBL 369–b (emphasis added). As the Practice Commentary to section 369–b makes clear, the purpose of the law is to:

prevent denial of manufacturer warranty service to customers ... because goods were sold by unauthorized dealers ... Abuse may arise if the manufacturer seeks to avoid an express warranty because the "wrong" dealer sold the goods ... this is the evil at which [GBL] 369–b is aimed.

GBL 369–b, Practice Commentaries, McKinney's Consol. Laws of N.Y., Vol. 19, at 523–24 (Givens).

I note here my disagreement with an assumption made by my distinguished colleague, Judge Buchwald, as to the meaning and application of GBL 369–b. *See Worldhomecenter.com, Inc. v. KWC America, Inc.*, 10 civ. 7781, Slip Copy, 2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011). In *Worldhomecenter*, Judge Buchwald expressed doubt whether a manufacturer's stated policy of refusing to honor warranties for customers, on the sole basis that the product was bought from an unauthorized internet retailer, violated, GBL 369–b: "This is because KWC's blanket disclaimer of warranties for all products sold by 'unauthorized Internet sellers' may be too general to fit within the statutory language of § 369–b, which voids warranty disclaimers for products 'sold by a particular dealer or dealers.'" *Id.*, at *8 (quoting N.Y. Gen. Bus. Law § 369–b). Judge Buchwald apparently believes that the word "particular" might refer simply to specific identified dealers, rather than to as entire class of dealers (those not authorized to sell by the manufacturer).

I read the phrase "particular dealer or dealers" less narrowly. According to The Practice Commentary to GBL 369–b, quoted above, the purpose of this section of the

GBL is to prevent enforcement of precisely the kind of policy adopted by Bel Canto: "denial of manufacturer warranty service to customers ... because goods were sold by unauthorized dealers." *See supra*. In light of the statute's purpose, the reference to "a particular dealer or dealers" can only refer to dealers deemed "unauthorized" by a manufacturer, for whatever reason. No purpose would be served by any greater limitation.

 Thus, I conclude that Bel Canto's stated policy of refusing to honor warranties of products for the sole reason that they were sold by unauthorized dealers is contrary to GBL 369–b.

Bel Canto suggests that GBL 369–b may not apply, at least not to sales made by MSS HiFi to customers who are not themselves located in New York. Territorial limits, if any, on the applicability of section 369–b apparently presents an issue of first impression. As the Second Circuit has instructed, the Court's job when faced with such a question is to " 'carefully to predict' how that question would be resolved by the New York Court of Appeals." *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 166 (2d Cir.1998).

Although no case brought to the Court's attention addresses the issue, the principles that govern the extraterritorial effect of New York consumer protection laws provide sufficient indication of how the New York Court of Appeals would rule if faced with the issue. Applying those principles, I conclude that all of Defendants' customers, wherever located, are entitled to the protection of GBL 369–b, because the transaction in which they purchased their goods was a "New York transaction."

GBL 369–b is in the same chapter of the General Business Law as GBL 349, which prohibits, "Deceptive acts or practices in the conduct of any business, trade or com-

merce or in the furnishing of any service *in this state*." GBL 349(a) (emphasis added). In *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002), the New York Court of Appeals limited territorial reach of GBL 349 as follows: "[T]he transaction in which the consumer is deceived must occur in New York." Although the decision in *Goshen* invokes the specific language and legislative history of section 349, the case nonetheless supports the broad proposition that New York consumer laws govern *transactions* that take place in New York, not just transactions that involve New York residents. *Id.*

Accepting this hypothesis, if any consumer, *via a New York transaction*, is refused warranty protection made available to purchasers from authorized dealers, on the sole basis that the consumer bought from a non-authorized dealer, that consumer is entitled to the protection of GBL 369–b. The warranty restriction will be treated as void, and the manufacturer must provide the same service it would have provided had the consumer bought from an authorized dealer.

The question then becomes: what constitutes a "New York transaction" that would trigger the application of section 369–b? The evidence before the Court shows that Defendants have customers all over the world. Moreover, Defendants execute many of their transactions on the internet. Assuming Bel Canto builds an amplifier in Minnesota, then sells it to an authorized dealer in Vermont, who surreptitiously sells it to Defendants, who remove the serial number and ship it from New York to an internet customers in Finland, does GBL 369–b apply?

Applying *Goshen*, courts have held that, "Although nonresident consumers are protected [by the GBL], at least some part of the underlying unlawful transaction affecting them must be completed in this state." *People v. Direct Revenue, LLC*, 19 Misc.3d 1124(A), 2008 WL 1849855 at *7 (Sup Ct New York County 2008); *see also Mountz v. Global Vision Prods.*, 3 Misc.3d 171, 770 N.Y.S.2d 603 (Sup Ct. New York County 2003). Lower courts applying this standard have held that "a telemarketing site and *even the receipt of Internet orders physically within New York State* appear to form a New York locus for a transaction covered by the New York State consumer protection statutes." *Id.* at 177, 770 N.Y.S.2d 603 (citing cases) (emphasis added); *Leider v. Ralfe*, 387 F.Supp.2d 283, 294 (S.D.N.Y.2005) (Baer, J.) (same).

The evidence in this case shows that MSS HiFi either sells merchandise in its New York store, or accepts and fills internet orders in New York. There is no evidence that Defendants presently operate out of any location outside of New York. Because all of MSS HiFi's customers buy either in store in New York City, or place internet orders that are received and filled in New York, all of MSS HiFi's customers are protected by GBL 369–b, and are therefore entitled to the same warranty protection they would have been entitled to if they had bought down the street from Bel Canto's authorized dealer.

Thus, Bel Canto cannot rely on MSS HiFi's status as a non-authorized dealer to establish a material difference—i.e., the absence of warranty and other services.

However, the evidence before the Court establishes that Bel Canto does not rely *solely* on MSS HiFi's unauthorized status for refusing to honor warranties—at least in some instances. GBL 369–b only bans refusals to honor warranties based *solely* on a dealer unauthorized status. A manufacturer may have other reasons for refusing to honor a warranty, and nothing in GBL 369–b prevents the manufacturer from enforcing such restrictions. *See*

GBL 369–b, Practice Commentaries, *supra*, at 525. For example, if a dealer is known to the manufacturer to handle the product in a negligent manner, risking damage before the product reaches the consumer, the manufacturer remains free to refuse to honor all warranties from that particular dealer. *Id.*[5]

First, the evidence shows that Bel Canto, as a policy, will refuse to honor warranties for products that have had their serial numbers altered.

In his first affidavit, McCormick says that, "If a consumer owns a Bel Canto product with a counterfeit serial number, it is not eligible for Bel Canto's warranty on parts and labor for the repair of the unit." McCormick Declaration ¶ 37. In his supplemental declaration, McCormick refers obliquely to "Bel Canto's policy of not honoring a factory warranty if the product is purchased from an unauthorized dealer *or the serial number is altered* ..." McCormick Supplemental Declaration ¶ 3; *see also* Hearing Tr. 11/29/11 (Rough), at 7–8. Although the Exhibit attached to this statement (a screen shot of Bel Canto's website) does not say anything about altered serial numbers—it just says that unauthorized dealer products are not eligible for warranty (Pl.'s Ex. 61)—McCormick's testimony convinces me that such a policy exists; the evidence shows that other manufacturers have such policies (Pl.'s Exs. 62, 64, 67), and the reasons argued by McCormick for refusing to honor a warranty when the serial number has been altered (e.g., tracking merchandise for regulators and recall, remedying safety-related complaints, quality control) make sense. See also McCormick Supplemental Declaration ¶ 10.

The quality control aspect of accurate external serial numbers is of particular importance. *See Zino*, 571 F.3d at 238. For example, McCormick testified that if a particular component in an amplifier is found to be defective, and that component was from a batch of components incorporated in Bel Canto products bearing serial numbers 1000–1010, then Bel Canto can quickly identify exactly which of its amplifiers needs to be serviced or recalled. (Hearing Tr. 11/28/11 (Rough), at 32–33.) If, however, the serial number has been altered, the customer will not be able to respond appropriately to a notice that machines with serial numbers 1000–1010 should be brought in for inspection. *Cf. Zino*, 571 F.3d at 240–41.

Unauthorized resales of trademarked goods that interfere with the mark holder's ability to exercise quality control are, like resales of materially different goods, outside the protection of the first sale doctrine. *Zip*, 2011 WL 2132980, at *4. The reason is simple:

> "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." Therefore, "[g]oods ... that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement."

*Id.* (quoting *El Greco Leather Prods. Co., Inc. v. Shoe World*, 806 F.2d 392, 395 (2d Cir.1986) and *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 78 (2d Cir.1994)). Thus, if an unauthorized dealer defends an infringement suit by claiming that it has done no more than stock and resell genuine articles bearing the plaintiff's trade-

---

5. This limitation, and the consequent narrowness of GBL 369–b's reach, provides another reason to reject the supposition that the reference to "particular dealer or dealers" is intended to refer to specific dealers, rather than to any and all unauthorized dealers.

mark, so that no possibility of confusion exists, the mark holder can overcome that defense by showing that the resale deprives the mark holder of an opportunity to exercise quality control.

In *Zino*, a high-end perfumier, Zino Davidoff, sued to stop CVS from reselling its fragrances. 571 F.3d at 238. Despite Davidoff's refusal to authorize CVS to carry its fragrances, CVS was able to obtain them outside the normal channels of distribution. Under the first sales doctrine, CVS had every right to resell them, so long as they were "genuine." However, as in this case, either CVS, or someone up its supply chain, altered UPC codes that Davidoff placed on the perfumes' packaging and imprinted on its bottle.

The Second Circuit held that these alterations deprived Davidoff of the ability to exercise quality control over its products in the marketplace, and therefore risked damaging the goodwill Davidoff had built up by delivering high quality products in the past. The Court explains:

> [T]he district court correctly found that Davidoff was likely to succeed on the merits in its contention that CVS's sales of its products with the UPC removed constituted trademark infringement. We recognize that, as a general rule, the Lanham Act does not impose liability for "the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner" because such a sale does not inherently cause confusion or dilution. However, we have held that goods are not genuine if they do not conform to the trademark holder's quality control standards, or if they differ materially from the product authorized by the trademark holder for sale.
>
> Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." In attaching its mark to its goods over time, a holder assures consumers that the goods conform to the mark holder's quality standards. Reputation for quality, whether good or bad, becomes associated with a mark in the minds of consumers. Many consumers are willing to pay more to buy goods bearing a mark which experience has taught the consumer represents an assurance of high quality....
>
> We ruled in *Warner–Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir.1996), that a trademark holder is entitled to an injunction against one who would subvert its quality control measures upon a showing that (i) the asserted quality control procedures are established, legitimate, substantial, and nonpretextual, (ii) it abides by these procedures, and (iii) sales of products that fail to conform to these procedures will diminish the value of the mark. *Id.* at 6.

*Zino*, 571 F.3d at 243–44 (some internal citations omitted).

The panel found that Davidoff was entitled to an injunction under this test, in part because its use of the UPC system— with which CVS's alteration of the UPC codes interfered—allowed Davidoff to "improve [it]'s ability to identify defective products, effectuate a targeted recall, and remedy production defects." *Id.* at 244.

Bel Canto's use of serial numbers to identify defective components and institute targeted recalls, if necessary, is directly analogous to Davidoff's use of its UPC system. Although I concluded that altered serial numbers qualify as "material differences," as an alternative holding, I find that the Second Circuit's "quality control" doctrine applies, based on the unavailability of warranty and other service stemming from the serial number alterations. *Cf. id.* at 246.[6]

Thus, I conclude that Bel Canto has a legitimate policy of refusing warranty service for products—even products sold in New York transactions—that bear altered serial numbers.

In light of Bel Canto's policy regarding altered serial numbers, any products sold by Defendants that bear altered serial numbers lack warranty and related services, and so are not "genuine" Bel Canto products. The practice of selling these products risks consumer confusion and damage to the goodwill Bel Canto has built up in its mark. Thus, Bel Canto has shown a strong likelihood of success on its claim that Defendants' practice of selling products with altered serial numbers is a violation of the Lanham Act.

Defendants object that, even if Bel Canto does refuse to honor warranties for products that have altered serial numbers, Bel Canto cannot obtain an injunction because it has not offered evidence of actual consumer confusion. (*See, e.g.,* Hearing Tr. 11/28/11 (Rough), at 123 ("We don't have any evidence here whatsoever that a consumer was confused by a serial number."); *id.* at 127 ("[T]he fact of the matter is that there is no evidence here, none, that any one was confused by anything by this alleged alteration of the serial num-

bers. Nobody.").) But Bel Canto is not required to demonstrate "actual confusion." As the Second Circuit has explained, "the [Lanham] Act requires only a *likelihood* of confusion ...." *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986) (emphasis added); *see also Gruner,* 991 F.2d at 1077. Bel Canto does not need to adduce evidence from customers who unknowingly bought a product with a fake serial number, sought and were denied warranty service, and developed a negative impression of Bel Canto as a result. It is enough that such an outcome is likely given Bel Canto's legitimate policies and Defendants' practices.

In any event, the email correspondence between Bel Canto and Saim Bensaada does demonstrate the likelihood that Defendants' consumers will be misled. Defendants object that Mr. Bensaada is not a United States citizen and therefore is not covered by the Lanham Act's protections, but Defendants' United States customers are similarly situated to Mr. Bensaada in all relevant respects.

Thus, I conclude that Bel Canto has shown a likelihood of success on so much of its Lanham Act claim as is premised on Defendants' unauthorized sale of Bel Canto products that bear altered serial numbers.

### E. "Cracking the case"

 As I have analyzed the case, the physical alteration of the serial number *by itself* voids the warranty, and thereby renders the product materially different from the genuine article. Defendants argue that alteration of the exterior serial number should not void the warranty, however,

---

**6.** I note that, in *Zino,* the Second Circuit relied on the "material difference" between products with altered and unaltered serial numbers as an alternative ground for ruling in favor of Davidoff.

because a customer can always access the interior serial number, and use it for all the purposes the serial number is intended to serve.

Defendants miss the point. Under my analysis of the case, it is enough that Bel Canto in fact has the policy it has, and that the policy serves legitimate business purposes. That policy, plus the fact of alteration, gives rise to a material difference, meaning that Defendants' products are not "genuine" Bel Canto products. Defendants' objection would be more apt if I instead treated this as a quality control case, along the lines of *Zino*, which I discussed above. 571 F.3d at 238. Its argument then would be that the "quality control" measure embodied in Bel Canto's use of a serial number system is a pretext for restricting legitimate, albeit unauthorized, resales of genuine articles.

However, Defendants' argument fails on these terms as well.

First, a recall notice directed at serial number 1004 would not do the owner of 1004 much good if the exterior of his product bore the serial number 3008. Unless the alteration had been disclosed to him, he would have no reason to inspect the interior serial number. Thus, the targeted recall goal that the serial number system furthers cannot be substantially attained by the existence of a hidden interior number.

Second, even if Defendants' customers knew to look for interior serial numbers, and compare them to the exterior numbers, any effort to do so would void their warranty. Bel Canto refuses to honor its warranty when the product has had its chassis removed—a process described in court as "cracking the case." Without cracking the case, a customer cannot see the interior serial number of a Bel Canto product. *See supra.* Refusing to honor a warranty on this basis is patently permissible under GBL 369–b. The quality control function that accurate external serial perform is not duplicated by accurate interior serial numbers, because to access those, the customer would need to take steps that would independently void its rights to warranty services.

Defendants have no right to place consumers in this Catch–22, a situation that will likely lead to confusion and loss of goodwill for Bel Canto. In doctrinal terms, this hidden snare in service rights renders the Bel Canto products Defendants sell "materially different" from genuine article Bel Canto products, *see Beltronics*, 562 F.3d at 1067; or, the policy with respect to "cracking the case" demonstrates why Bel Canto's quality control measures are not merely pretextual. That is, accurate external serial numbers serve a quality control purpose not adequately served by accurate internal serial numbers, so that Bel Canto's insistence on accurate external numbers cannot be said to be a mere pretext for excluding discounters.

An additional consequence of my conclusion that Bel Canto adheres to a policy of refusing to honor warranties for products if their cases have been cracked is that it renders any product Defendants sell overseas "materially different" from a genuine article Bel Canto product. The evidence showed that (1) a voltage conversion is required for Bel Canto products manufactured for the domestic market that are sold overseas; (2) all the Bel Canto products Defendants sell were manufactured for the domestic market; (3) voltage conversion requires removing the chassis; and (4) that, as a result, Defendants' practice of converting voltage for its overseas customers voids those customers' warranties for a reason that Bel Canto is privileged to honor, in spite of GBL 369–b. As with the alteration of serial numbers, this

practice too makes the products that Defendants sell not genuine, risks consumer confusion and damage to Bel Canto's goodwill, and therefore constitutes infringement under the Lanham Act.

Thus, Bel Canto has also shown a likelihood of success on this issue as well.

*F. Preliminary injunctive relief is appropriate to prevent further violations of the Lanham Act, consumer confusion, and damage to Bel Canto's good will*

As noted previously, to obtain a preliminary injunction it is enough for Bel Canto to demonstrate irreparable injury and a likelihood of success on the merits. As just discussed, Bel Canto has shown a likelihood of success on its claims that (1) Defendants' sale of Bel Canto products bearing altered serial numbers creates a likelihood of consumer confusion and injury to Bel Canto's goodwill, and (2) that Defendants' practice of "cracking the case" to perform voltage conversions for its overseas customers does so as well.

As for irreparable injury, the Second Circuit has held that a "plaintiff who establishes that an infringer's use of its trademark creates a likelihood of consumer confusion generally is entitled to a presumption of irreparable injury." *Zino,* 571 F.3d at 246 (quoting *Weight Watchers Int'l, Inc. v. Luigino's, Inc.,* 423 F.3d 137, 144 (2d Cir.2005)). Bel Canto is entitled to that presumption here, and Defendants do nothing to rebut it.

Thus, I find that Bel Canto has also demonstrated irreparable injury, and is therefore entitled to the preliminary injunctive relief.

*G. Form of the Injunction*

Defendants are hereby preliminarily enjoined, as follows:

(1) Defendants shall not make any false claim of affiliation with, or endorsement by, Bel Canto, its agents, or any other affiliated entity;

(2) Defendants shall not advertise or sell any Bel Canto product bearing an altered serial number, whether it was altered by Defendants or by Defendants' supplier; and

(3) Defendants shall not advertise or sell any Bel Canto product, where Defendants have taken steps that have voided that product's warranty, including but not limited to opening the product's chassis to perform unauthorized voltage conversions.

### CONCLUSION

Bel Canto's motion for a preliminary injunction is GRANTED in part and DENIED in part. The parties are hereby instructed to submit, on or before Thursday, December 22, 2011, a joint case management plan to govern discovery pending the Court's decision on Bel Canto's motion to dismiss Defendants' counter-claims.